**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

ZACHARY LEE CHURCH,

              Plaintiff,

vs.

BOB ANDERSON, Individually and in his
Official Capacity as a Police Officer for the
Cedar Falls Police Department, JEFF
OLSON, Individually and in his Official
Capacity as Chief of Police, and CEDAR
FALLS, IOWA,

              Defendants.

No. C15-3171-MWB


**OPINION AND ORDER
REGARDING DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT**

_____

**TABLE OF CONTENTS**

**I.   INTRODUCTION AND BACKGROUND** ............................................................. **2**
   **A.   Factual Background** ...................................................................................... **2**
   **B.   Procedural Background** ................................................................................ **7**
**II.   LEGAL ANALYSIS** ................................................................................................. **8**
   **A.   Summary Judgment Standards** ................................................................... **8**
   **B.   Heck Preclusion** ......................................................................................... **10**
   **C.   Qualified Immunity** ................................................................................... **15**
      **1.   Standards for qualified immunity** ................................................. **15**
      **2.   Excessive force claim** ...................................................................... **19**
   **D.   State Law Claims** ....................................................................................... **23**
**III.   CONCLUSION** ...................................................................................................... **25**

Early in the morning of Christmas day, December 25, 2013, Cedar Falls police officer Bob Anderson shot Zachary Lee Church while attempting to arrest him. Church has sued Anderson, the City of Cedar Falls ("Cedar Falls"), and Cedar Falls's police chief under 42 U.S.C. § 1983, asserting, *inter alia*, that Anderson violated Church's Fourth Amendment rights by using excessive force. Defendants have moved for summary judgment on all claims on the basis, *inter alia*, of qualified immunity.

## I.    INTRODUCTION AND BACKGROUND
### A.    Factual Background

I set out only those facts, disputed and undisputed, sufficient to put in context the parties' arguments concerning defendants' Motions for Summary Judgment and resistance to them.[1] At least for the purposes of summary judgment, the facts recited, here, are either undisputed or facts construed in the light most favorable to the nonmoving party, Church. I will discuss additional factual allegations, and the extent to which they are or are not disputed or material, if necessary, in my legal analysis.

Early in the morning of December 25, 2013, Cedar Falls police officer Bob Anderson was on patrol. At that time, Anderson was an experienced police officer, who had worked at the Cedar Falls Police Department for more than 20 years. Anderson had extensive training in firearms, roadside impairment, and hostage negotiation. He had been a firearms instructor for approximately 10 years and was also an OWI and field sobriety instructor. Anderson was about to complete his shift when, shortly before 3:00 a.m., he noticed a running vehicle with an occupant parked along 2nd Street in Cedar Falls, with its lights on. Anderson circled the block and approached the vehicle from behind. Anderson pulled up next to the driver's side of the vehicle. While still in his patrol car, Anderson shined his flashlight into the vehicle. Anderson saw Church slumped forward against the

_____

[1]Church's objection to the form of defendants' statement of facts is overruled.

steering wheel.  Anderson did not know the individual or recognize the vehicle.  Church did not react to Anderson's patrol car or the flashlight shining into his vehicle.

At the time, Church was 27 years old.  He grew up in Parkersburg, Iowa, approximately 20 miles from Cedar Falls.  On December 24, 2013, Church worked a six-hour shift as a cook at Toad's Bar & Grill ("Toad's").  Church's shift ended at approximately 9:00 p.m.  He then had drinks at the bar with friends and co-workers.  Church drank an unknown quantity of alcohol on the evening of December 24, 2013.  After approximately an hour and a half, Church drove two of the people he was drinking with home.  It took Church between five and fifteen minutes to drop both people at their homes.  Church then returned to Toad's for an unknown period of time.

Anderson moved his patrol car behind Church's vehicle, and turned on his rear warning flashers.  He then contacted the dispatch center and informed dispatch of his location, Church's vehicle's license number, and that he saw someone sleeping in the vehicle.  Anderson then approached Church's vehicle.  Church remained unresponsive and slumped forward.  Anderson checked the vehicle's door and found it unlocked.  He opened the vehicle's door and smelled the strong odors of alcohol and burnt marijuana.

Church began making fumbling movements toward the ignition switch and gearshift selector.  Anderson noticed these movements, and reacted by reaching in and turning off the vehicle and taking the keys out of the ignition.  Anderson noticed that Church displayed signs of intoxication.  Specifically, Anderson observed that Church's eyes were bloodshot and watery, and his face was flushed.  Based on his observations, Anderson requested a backup police officer be sent to that location.  Anderson asked Church to step out of his vehicle and to show him some form of identification.  Church complied and told Anderson that he had been visiting a friend who lived on the street.  Anderson conducted a quick pat-down search of Church.  In conducting the pat down, Anderson felt a good-sized lump in Church's right-hand coat pocket and followed up by shining a flashlight into the pocket.  However, that pocket contained only Church's wallet and cash.  Anderson did not locate

any weapons on Church.  Anderson asked Church if there was any marijuana in the vehicle.  Anderson told him that he could smell marijuana and if there was marijuana in the vehicle, he was going to find it.  Church denied that there were any drugs in his vehicle.

Anderson escorted Church toward the patrol car.  He intended to have Church sit in the rear of the patrol car until the backup police officer arrived.  He then intended to take Church to the police station to conduct field sobriety tests in a controlled environment, because it was cold outside and there was snow on the ground.  As they were walking to the patrol car, Church asked Anderson what was going on.  Anderson replied that he could smell alcohol and that there was an indication that Church had been drinking, so Anderson wanted to run some checks to make sure that Church was okay to drive.  Anderson took Church to the patrol car's rear door on the passenger side of the patrol car.  Anderson opened the rear passenger door and instructed Church to have a seat.  Church asked, "in this car?" and Anderson replied in the affirmative.

Without warning, Church struck the left side of Anderson's head with a roundhouse punch from his right hand.  Church was 6'2" tall and weighed 268 pounds while Anderson was 5'7" tall and weighed 190 pounds.  Church's punch dropped Anderson to his knees.  Anderson wrapped his arms around Church's legs to contain him.  Church responded by punching Anderson several more times.  Anderson then attempted to get on his radio to advise dispatch that he was in trouble.  Church was punching Anderson with his right hand and Anderson had his left hand up to deflect the punches.  Anderson testified that, because he was using his left hand to deflect Church's punches, he was unable to use nonlethal forms of defense, his ASP baton, pepper spray, and taser, because they were located on the left side of his duty belt.  Anderson noticed that his microphone had been knocked loose and was dangling.  Anderson grabbed the microphone and attempted to contact dispatch.  As Anderson did this, he felt a sharp tug on his hip as though his duty belt, where his pistol was located, was being pulled.  Anderson and Church then started backing up toward the front of the patrol car.  Church advanced on Anderson throwing punches.  Anderson ended

up on his back.  Anderson estimates that Church punched him three or four more times while he was on the ground.  Anderson was physically exhausted, dizzy, and lightheaded.

While using his left hand to defend against Church's punches, Anderson commanded Church to stop or "I will shoot you."  Anderson's App. at 71; Anderson Tr. Tran. at 147.  Despite Anderson's warning, Church advanced toward Anderson again.  Anderson, fearful that he was losing consciousness and Church might kill him, shot Church with his pistol.  The first shot backed Church up, but then he started moving toward Anderson again.  Anderson responded by firing two more shots at Church.  Anderson saw Church run toward his vehicle, but did not pursue because he could not get up.

Anderson had shot Church three times: in the lower left abdomen, the upper front left shoulder, and in the right collarbone/shoulder blade entering in the right posterior, inferior shoulder.  The shot that hit Church in the abdomen was fired from approximately 18 to 24 inches away.  The absence of gun powder residue on either of the other bullet's entrance wounds indicates that the gun was fired from a distance of over four feet.

Cedar Falls police officer Katie Burkhardt was one of the police officers who responded to the scene.  When she arrived, she saw Anderson laying on his back in the snow near the passenger side of his patrol car.  She repeatedly asked Anderson if he was okay and he finally responded in a "very winded" voice that he had his gun.  Anderson's App. at 71; Burkhardt Tr. Tran. at 457-58.  Burkhardt saw Anderson's stocking cap, eyeglasses, a glove, Church's driver's license, and a set of car keys laying on the ground in the snow near the passenger door of Anderson's patrol car.

Anderson was taken to Sartori Memorial Hospital ("Sartori") in Cedar Falls by ambulance.  The responding emergency medical technicians noted that Anderson was conscious, but dazed.  They further noted that he had multiple abrasions and minor lacerations on both sides of his head.  They also charted bruising on his left temple. Anderson was treated in the emergency room at Sartori.  The treating physician, Dr. Laura Hoffman, noted abrasions to Anderson's face and a minor abrasion to his right arm.  The

primary diagnosis was traumatic injury due to assault; assault by person; abrasion to face; and injury to the head.

Church was also treated at Sartori. He was diagnosed with 3 gunshot wounds: one to the abdomen, one to the left shoulder, and one to the right shoulder. Church was sedated for approximately six days and was discharged on January 6, 2014.

Criminal charges were filed against Church and a trial was held. Church did not raise a self-defense claim in his criminal trial. On July 2, 2015, the jury found Church guilty of possession of a controlled substance with intent to deliver and operating a motor vehicle while intoxicated. The jury did not find Church guilty of assault on a peace officer with intent to inflict serious injury, in violation of Iowa Code § 708.3A(1), but found him guilty of the lesser included offense of assault on a peace officer, in violation of Iowa Code § 708.3A(4).

The Cedar Falls Police Department has adopted a policy on the use of force that is consistent with national standards. Cedar Falls police officers receive training in the use of force including firearms. The firearms training that Cedar Fall Police Officers receive exceeds state standards. Prior to the incident with Church, Anderson had received substantial training in the use of firearms and in nonlethal force, including ASP baton, Taser, and verbal de-escalation techniques. The Cedar Falls Police Department has no prior history of improper use of firearms by its officers. In the more than 30 years Chief Jeff Olson has been with the department, this is the first and only allegation of improper use of deadly force by a Cedar Falls police officer.[2] Church is the only person who has been shot by a police officer in Cedar Falls in the same 30-year period.

---

[2] There is no question in this case that Anderson's firing of his pistol at Church constituted deadly force. "Deadly force is such force that creates a substantial risk of causing death or serious bodily harm." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009) (quotation marks omitted); *see e.g., Smith v. City of Hemet*, 394 F.3d 689,

(Footnote continued . . .

### B.    Procedural Background

On December 23, 2015, Church filed a Complaint concerning the incident that took place on December 25, 2013, naming Anderson, Cedar Falls, and Police Chief Jeff Olson as defendants (docket no. 2).  In Count 1, Church alleges that Anderson used excessive force in attempting to arrest him, in violation of the Fourth Amendment of the United States Constitution.  Church brings this cause of action under 42 U.S.C. § 1983.  In Count 2, Church alleges that Anderson used excessive force in attempting to arrest him, in violation of the Fifth and Fourteenth Amendments of the United States Constitution.  Church, again, brings this cause of action under § 1983.[3]  In Count 3, Church brings a cause of action under § 1983, alleging that defendants Jeff Olson and Cedar Falls failed to train and supervise their employees in violation of the Constitution.[4]  In Count 4, Church asserts a common law claim for assault and battery against Anderson.  In Counts 5 and 6, Church asserts common law claims for negligence against Anderson, Count 5, and Olson and Cedar Falls, Count 6.  In Count 7, Church alleges that Olson and Cedar Falls are liable for the actions of Anderson under the doctrine of respondeat superior.  On February 8, 2016, Cedar Falls and Olson filed a joint Answer, denying the claims against them and asserting various

---

693 (9th Cir. 2005) (defining "deadly force as force that creates a substantial risk of causing death or serious bodily injury."); *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998) (same); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (same); *Ryder v. City of Topeka*, 814 F.2d 1412, 1416 n. 11 (10th Cir. 1987) (same); *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988) (same); *Pruitt v. City of Montgomery*, 771 F.2d 1475, 1479 n. 10 (11th Cir. 1985) (same); *Mattis v. Schnarr*, 547 F.2d 1007, 1009 n. 2 (8th Cir. 1976) (en banc), *vacated as moot sub nom., Ashcroft v. Mattis*, 431 U.S. 171 (1977) (same).  Thus, deadly force includes shooting a person with a firearm even where that person does not die.

[3]Church has since withdrawn this claim.

[4]Church has also withdrawn this claim.

affirmative defenses. Anderson subsequently filed his Answer on March 29, 2016, denying the claims and asserting various affirmative defenses.

Cedar Falls and Olson, and Anderson have each filed Motions for Summary Judgment. Each defendant has joined the other's motion. Defendants initially argue that Church's claims are barred under the United States Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994). Church disputes that the *Heck* decision bars his excessive force claim here. Defendants also argue that Anderson is entitled to summary judgment based on "qualified immunity." Church contends that Anderson violated Church's right to be free from the use of "excessive force" by shooting him and that summary judgment is inappropriate because there are genuine issues of material fact concerning whether Anderson's actions were reasonable under the circumstances. Defendants counter that Anderson's use of deadly force was objectively reasonable given Church's unprovoked assault on him. Finally, defendants argue that they are entitled to summary judgment on Church's state law claims, because Anderson's actions were objectively reasonable. Church counters that summary judgment is inappropriate as to his state law claims because there are genuine issues of material fact concerning whether Anderson's actions were reasonable under the circumstances.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact *and* that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see*

*generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, "[t]he movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323). In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

When the parties have met their burden, the district judge's task is as follows:

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, —— U.S. ——, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weigh-ing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). . . . . "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson*, 643 F.3d at 1042-43.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 776 (8th Cir. 2012). However, summary judgment is particularly appropriate when only

questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

With these standards in mind, I will address defendants' Motions for Summary Judgment.

## B.      *Heck Preclusion*

Defendants contend that Church's claims are barred by *Heck*, 512 U.S. 477. Church argues that the *Heck* decision does not bar his excessive force claim here. In *Heck*, Roy Heck was convicted of manslaughter in an Indiana state court. *Id.* at 478. Heck filed an appeal within the state judicial system. *Id.* While his state appeal was pending, Heck also filed a § 1983 action, alleging three state actors violated his rights by destroying exculpatory evidence. *Id.* at 478–79. Heck only requested monetary damages in his federal claim; he did not seek an injunction ordering his release. *Id.* at 479. Presumably, Heck's claim was predicated on the suggestion in *Preiser v. Rodriguez*, 411 U.S. 475 (1973) that a prisoner could bring a suit for damages under § 1983, without first exhausting state remedies.[5] *See Preiser*, 411 U.S. at 494 ("[A] damages action by a state prisoner could be brought under [§ 1983] in federal court without any requirement of prior exhaustion of

---

[5]In *Preiser*, three state prisoners challenged the revocation of their good time credits for disciplinary reasons. *Id.* at 477–82. The prisoners alleged that their credits had been revoked in an unconstitutional manner and specifically sought an injunction reinstating their revoked good time credits. *Id.* at 487. Instead of proceeding under the habeas corpus statute, the three prisoners filed an action under § 1983, namely because they desired to forego exhausting their state remedies as is required under the habeas statute. *Id.* at 488. Thus, the issue addressed by the Court in *Preiser* was which statute controlled—the general verbiage enunciated in § 1983 or the more specific language promulgated in § 2254. *Id.* at 482, 489–90. The *Preiser* Court determined that the specific statute, § 2254, took precedence over the more general parameters set forth in § 1983. *Id.* at 500 ("Upon that question, we hold today that when a state prisoner is challenging the very fact or duration of his physical imprisonment . . . his sole federal remedy is a writ of habeas corpus.").

state remedies.”); *see also Heck*, 512 U.S. at 481. The Supreme Court granted *certiorari* in order to clarify the “unreliable, if not unintelligible” dicta enunciated in *Preiser. Heck*, 512 U.S. at 482.

The Court ultimately determined that a state prisoner’s claims were not cognizable under § 1983 when the resolution of such a claim would call into question the validity of an outstanding criminal conviction or sentence. *Id*. at 486–87. The full Court joined Justice Scalia’s opinion, holding that:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination or called into question by a federal court’s issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether the judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff’s action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

*Id.* However, although all nine Justices agreed with the pronouncement of a “favorable-termination” prerequisite to filing a § 1983 action that might challenge an outstanding conviction or sentence, the Justices split with respect to not only the rationale underlying the Court’s conclusion, but also the reach of such a requirement. Justice Scalia, joined by four other Justices, based his analysis on a comparison of the common law principles

behind the tort of malicious prosecution. *Id.* at 484–86. Under the common law, as part of a prima facie case of malicious prosecution, a plaintiff was required to allege and prove that the termination of the prior criminal proceeding had been resolved in favor of the accused as part of their prima facie case. *Id.* at 484. The favorable termination requirement developed in the common law tort because it prevented criminal defendants from collaterally attacking their sentences. *Id.* at 484–85. Justice Scalia observed:

> This requirement "avoids parallel litigation over the issues of probable cause and guilt . . . and it precludes the possibility of the claimant [sic] succeeding in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction."

*Id.* at 484 (quoting 8 S. SPEISER, C. KARUSE, AND A. GANS, AMERICAN LAW OF TORTS, § 28:5, p. 24 (1991)). Accordingly, Justice Scalia concluded that the "hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, just as it has always applied to actions for malicious prosecution."[6] *Id.* at 486.

---

[6]Justice Souter wrote a concurring opinion, in which he was joined by three other Justices. *Id.* at 491–503 (Souter, J., concurring). Although Justice Souter concurred in the application of the favorable termination rule to § 1983 actions under the circumstances addressed in *Heck*, he disputed the reasoning behind and the perceived breadth of the Court's conclusion. *See id.* at 492, 499–500 (Souter, J., concurring). Justice Souter did not object to the majority's reference to the common law and the tort of malicious prosecution, however, he felt the common law should operate as merely a starting point for the inquiry under § 1983. *Id.* at 492 (Souter, J., concurring). Justice Souter questioned the majority opinion's strict reliance on common law principles and opined that the same result could have been reached by simply applying the principles set forth in *Preiser* to § 1983 claims for damages. *Id.* at 493–97 (Souter, J., concurring). Justice Souter noted that an

(Footnote continued . . .

Following *Heck*, the Supreme Court emphasized the need for a clear nexus between the plaintiff's conviction and the alleged wrongful government action before the *Heck* bar applies. The Court observed that:

> [W]e were careful in *Heck* to stress the importance of the term "necessarily." For instance, we acknowledged that an inmate could bring a challenge to the lawfulness of a search pursuant to § 1983 in the first instance, even if the search revealed evidence used to convict the inmate at trial, because success on the merits would not "necessarily imply that the plaintiff's conviction was unlawful." 512 U.S. at 487, n. 7, 114 S. Ct. 2364 (noting doctrines such as inevitable discovery, independent source, and harmless error). To hold otherwise would have cut off potentially valid damages actions as to which a plaintiff might never obtain favorable termination . . .

*Nelson v. Campbell*, 541 U.S. 637, 647 (2004).

Here, Church was charged with assault on a peace officer with intent to inflict serious injury, in violation of Iowa Code § 708.3A(1), possession of a controlled substance with intent to deliver, and operating while intoxicated. Following trial, the jury did not find Church guilty of assault on a peace officer with intent to inflict serious injury, but found him guilty of the lesser included offense of assault on a peace officer, in violation of Iowa Code § 708.3A(4). Thus, whether this suit is barred by *Heck* turns on whether an

---

award of damages against state officials for unlawful confinement would, "practically, compel the State to release the prisoner." *Id.* at 497 (Souter, J., concurring). Thus, Justice Souter agreed that, regardless of the type of relief sought, allowing a state prisoner to challenge his conviction or sentence under § 1983, "'would wholly frustrate explicit congressional intent' as declared in the habeas exhaustion requirement." *Id.* at 497–98 (Souter, J., concurring) (quoting *Preiser*, 411 U.S. at 489). Thus, as in *Preiser*, Justice Souter posited that "the statutory scheme must be read as precluding such attacks." *Id.* at 498 (Souter, J., concurring).

(Footnote continued . . .

action against Anderson for excessive use of force necessarily implies the invalidity of Church's assault conviction.[7]

It is clear that a decision in Church's favor would not create two conflicting resolutions arising out of the same incident. Such a result is possible if, even though Church assaulted Anderson, Church suffered unnecessary injuries because Anderson's response to the assault was not objectively reasonable. Application of *Heck,* here, would imply that once a person assaults a law enforcement officer, "he has invited the police to inflict any reaction or retribution they choose, while forfeiting the right to sue for damages." *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006). "This would open the door to undesirable behavior and gut a large share of the protections provided by § 1983." *Id.* Accordingly, I conclude that Church's excessive force claim is not barred by the *Heck* doctrine. *See id.; see also Colbert v. Monticello,* 775 F3d 1006, 1008 (8th Cir. 2014) (holding that there is no inherent conflict between finding that police officers used excessive force in effectuating arrest, and conviction for resisting arrest and harassment of police officer; state court's determination that individual resisted lawful arrest may coexist with finding that officers used excessive force to subdue him); *Thore v. Howe,* 466 F.3d 173, 180 (1st Cir. 2006) (recognizing that "[a] § 1983 excessive force claim brought against a police officer that arises out of the officer's use of force during an arrest does not necessarily call into question the validity of an underlying state conviction and so is not barred by *Heck.* . . . Even the fact that [the] defendant was convicted of assault on a police officer does not, under *Heck*, as a matter of law necessarily bar a § 1983 claim of excessive force."). Therefore, Summary Judgment based on the *Heck* doctrine is denied.

---

[7] The jury also convicted Church on the other two charges. Defendants, however, do not contend that a judgment in favor of Church, in this case, would necessarily imply the invalidity of Church's drug and OWI convictions.

### C. Qualified Immunity

#### 1. Standards for qualified immunity

Defendants also seek summary judgment on Church's claims on the basis of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see Burton v. St. Louis Bd. of Police Cmm'rs*, 731 F.3d 784, 791 (8th Cir. 2013) (quoting *Winslow v. Smith*, 696 F.3d 716, 730 (8th Cir. 2012)); *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011); *Fields v. Abbott*, 652 F.3d 886, 890 (8th Cir. 2011). In *Pearson*, the United States Supreme Court offered this explanation of the reasoning behind the concept of qualified immunity:

> Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S. Ct. 1284, 157 L.Ed.2d 1068 (2004) (KENNEDY, J., dissenting) (quoting *Butz v. Economou*, 438 U.S. 478, 507, 98 S. Ct. 2894, 57 L.Ed.2d 895 (1978), for the proposition qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law").

*Pearson*, 555 U.S. at 231. Furthermore, "[q]ualified immunity is 'an immunity from suit rather than a mere defense to liability, [so that] it is effectively lost if a case is erroneously permitted to go to trial.'" *Id.* at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Thus, the Supreme Court has "'repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The Supreme Court and the Eighth Circuit Court of Appeals have explained that "[e]valuating a claim of qualified immunity requires a 'two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.'" *Burton*, 731 F.3d at 791 (quoting *Winslow*, 696 F.3d at 730, with internal quotation marks and citations omitted); *accord Pearson*, 555 U.S. at 232; *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236; *Johnson*, 658 F.3d at 825; *Fields,* 652 F.3d at 890; *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009). The official is entitled to qualified immunity unless the answer to both of these questions is yes. *Burton*, 731 F.3d at 791 (quoting *Winslow*, 696 F.3d at 730, with internal quotation marks and citations omitted); *Krout,* 583 F.3d at 564.

Considering the two prongs of the test in a little more detail, "[i]f the allegations and undisputed facts do not amount to a constitutional violation, 'there is no necessity for further inquiries concerning qualified immunity.'" *Habhab v. Hon*, 536 F.3d 963, 969 (8th Cir. 2008) (quoting *Saucier*, 533 U.S. at 201). Thus, the court must consider whether the factual record, viewed in the light most favorable to the plaintiff, supports a conclusion that the defendant officer or officers violated the plaintiff's constitutional rights. *SL ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Police Comm'rs*, 725 F.3d 843, 850 (8th Cir. 2013).

As to the "clearly established law" prong, the Eighth Circuit Court of Appeals has explained,

> "'[I]n the light of pre-existing law the unlawfulness [of the official's action] must be apparent.'" *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002), quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987). "Qualified immunity would be defeated if an official *knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff[s]." *Gordon ex*

> *rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006) (alterations omitted) (emphasis in original) (citation and internal quotation marks omitted); *see Sisney v. Reisch*, 674 F.3d 839, 847 (8th Cir. 2012) (explaining that officials receive qualified immunity if they lacked "fair notice" that their actions were unlawful). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (citation and internal quotation marks omitted).

*Scott v. Baldwin*, 720 F.3d 1034, 1036 (8th Cir. 2013).

Moreover, as the Supreme Court has rejected the adequacy of prior recognition of a generalized right to satisfy the "clearly established right" prong of the analysis:

> We have repeatedly told courts—and the Ninth Circuit in particular, *see Brosseau v. Haugen*, 543 U.S. 194, 198–199, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam)—not to define clearly established law at a high level of generality. *See also, e.g., Wilson [v. Layne]*, [526 U.S. 603,] 615, 119 S. Ct. 1692 [(1999)]; *Anderson [v. Creighton]*, [483 U.S. 635,] 639–640, 107 S. Ct. 3034 [(1987)]; *cf. Sawyer v. Smith*, 497 U.S. 227, 236, 110 S. Ct. 2822, 111 L.Ed.2d 193 (1990). The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established. *See Saucier v. Katz*, 533 U.S. 194, 201–202, 121 S. Ct. 2151, 150 L. Ed.2d 272 (2001); *Wilson, supra,* at 615, 119 S. Ct. 1692.

*Ashcroft v. al-Kidd*, 563 U.S.731, 742 (2011). This does not mean, however, that prior precedent exactly on point is required to demonstrate that the unconstitutionality of the officer's actions was "clearly established":

> "A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Shekleton [v. Eichenberger]*, 677 F.3d [361,] 367 [(8th Cir. 2012)] (internal

> alteration marks omitted). "[T]he unlawfulness must merely be
> apparent in light of preexisting law, and officials can still be on
> notice that their conduct violates established law even in novel
> factual circumstances." *Nelson v. Corr. Med. Servs.*, 583 F.3d
> 522, 531 (8th Cir. 2009) (en banc) (internal citation and
> quotation marks omitted).

*Winslow v. Smith*, 696 F.3d 716, 738 (8th Cir. 2012). Whether a constitutional right at issue was "clearly established" is a question of law for the court to decide. *Bishop v. Glazier*, 723 F.3d 857, 961 (8th Cir. 2013) (citing *Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009)).

Under *Pearson*, I have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236 (holding that the sequence of the two-prong test as set forth in *Saucier*, while often appropriate, is not mandatory); *Johnson*, 658 F.3d at 825; *Fields*, 652 F.3d at 890. Indeed, the full two-step protocol "should not be regarded as mandatory in all cases," even though "it is often beneficial." *Id.* The Court reiterated in *Pearson* that "'[i]t often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be.'" *Id.* (quoting *Lyons v. Xenia*, 417 F.3d 565, 581 (6th Cir. 205) (Sutton, J., concurring). On the other hand, considering both questions "sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case," because "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 236-37. Specifically, in *Pearson*, the Court found that the "clearly established right" prong of the analysis was fully dispositive of the case before it, because it established that the officers involved were entitled to qualified immunity. *Id.* at 243-45; *accord Bishop*, 723 F.3d at 961-62 (starting and ending its analysis of qualified immunity with the second prong of the analysis, the "clearly established right" determination); *Hess v. Ables*, 714 F.3d 1048, 1051 (8th Cir. 2013) ("If [the law] was not clearly established, regardless of

whether [the plaintiff] has articulated a constitutional violation, the [defendants] are entitled to qualified immunity.").

The Eighth Circuit Court of Appeals reviews *de novo* a decision granting summary judgment on the basis of qualified immunity. *Burton*, 731 F.3d at 791 (quoting *Winslow*, 696 F.3d at 730, with internal quotation marks and citations omitted).

### 2. Excessive force claim

Defendants assert that Anderson is entitled to summary judgment, on Church's excessive force claim, based on qualified immunity. Initially, I will consider whether there was a constitutional violation. *Krout*, 583 F.3d at 563–64 (Explaining the initial inquiry in a qualified immunity analysis as "whether the facts alleged or shown, construed in the light most favorable to [the nonmoving party], establish a violation of a constitutional or statutory right. . . .").

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Brown*, 574 F.3d at 496 (quoting *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006) in turn quoting *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004) and *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994)). The parties dispute whether Church's right to be free from the use of "excessive force" was violated. The Eighth Circuit Court of Appeals has identified various principles for the application of the "objective reasonableness" standard for claims of "excessive force." The standard to apply in deadly force cases is well settled:

> "The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation. [*Graham*, 490 U.S. at] 397, 109 S. Ct. 1865. We must consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of

> the officer or others, and whether the suspect is actively fleeing
> or resisting arrest. *Id.* at 396, 109 S. Ct. 1865."

*Malone v. Hinman*, 847 F.3d 949, 952 (8th Cir. 2017) (quoting *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012)). The court has also explained, "[t]his calculus allows 'for the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Brown*, 574 F.3d at 496 (quoting *Graham*, 490 U.S. at 397); *Wilson*, 209 F.3d at 716 ("'The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'") (quoting *Graham*, 490 U.S. at 396–97).

The United States Supreme Court explained the general precepts concerning the use of deadly force against a suspect in *Tennessee v. Garner*, 471 U.S. 1 (1985). In *Garner*, an unarmed fifteen year-old broke into a house and stole ten dollars and a purse. A police officer arrived on the scene when the fifteen-year-old was climbing a six-foot fence in order to escape. When the suspect ignored commands to stop, the officer shot him in the back of the head, killing him. The Court explained that it is not always permissible to use deadly force to prevent the escape of felony suspects, and held that if there is no immediate threat to the officer or others, deadly force is unjustified. *Id.* at 11. Because the fifteen year-old was not a threat and the officer only shot him to prevent escape, the Court held that the use of deadly force was unconstitutional. *Id.*

It is well settled that this reasonableness standard "is viewed from the vantage point of the police officer at the time of arrest or seizure." *Gill v. Maciejewski*, 546 F.3d 557, 562 (8th Cir. 2008) (citing *Wertish*, 433 F.3d at 1066); *see also Billingsley v. City of Omaha*, 277 F.3d 990, 993 (8th Cir. 2002) ("The aforementioned reasonableness of force is judged from the perspective of the officer on the scene, taking into consideration the facts known

to him, as opposed to one possessing the illuminating power of hindsight.") (citing *Nelson v. County of Wright*, 162 F.3d 986, 989 (8th Cir. 1998)); *Nelson*, 162 F.3d at 990 ("The issue of reasonableness must be examined from the perspective of the facts known to the officer at the time of the incident.") (citing *Schulz v. Long*, 44 F.3d 643, 648 (8th Cir. 1995). "'Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Howard v. Kansas City Police Dept.*, 570 F.3d 984, 989 (8th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). "Circumstances relevant to the reasonableness of the officer's conduct include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). The court may also "consider the result of the force," *id.* (citing *Littrell*, 388 F.3d at 583), "the extent of the suspect's injuries," *Mann v. Yarnell*, 497 F.3d 822, 826 (8th Cir. 2007) (citing *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003)), "as well as standard police procedures." *Mann,* 497 F.3d at 826 (citing *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995)).

Judging the reasonableness of Anderson's use of force from the perspective of a reasonable officer on the scene, and viewing the facts in the light most favorable to Church, I conclude that Anderson's conduct was objectively reasonable under these circumstances. *See Kuha v. City of Minnetonka*, 365 F.3d 590, 597 (8th Cir. 2003). Anderson's use of deadly force was reasonable because he had probable cause to believe Church posed a threat of serious physical harm or death.[8] *Loch*, 689 F.3d at 965 (citing *Tennessee v.*

---

[8] Church's assault of Anderson is established as a matter of law because the doctrine of collateral estoppel bars Church from relitigating the issues from his criminal case here. Under Iowa law, collateral estoppel prohibits the relitigation of an issue when that issue

(Footnote continued . . .

*Garner*, 471 U.S. 1, 11(1985)); *see Thomson v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009) (observing that an officer's use of deadly force is reasonable only "if a reasonable officer in Defendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others."); *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly unfolding situation, has probable cause to believe that a suspect poses a serious threat either to the police or members of the public.") (citations omitted). Under the chaotic and rapidly-evolving circumstances facing Anderson, it was reasonable for him to perceive Church as an actual serious threat. After all, Church attacked him without warning and refused to stop his attack even in the face of Anderson's explicit warning that he was prepared to use deadly force to thwart Church's assault on him. Church points to the fact that the jury in his criminal trial convicted him of the lesser included charge of assault on a peace officer, and not the originally charged

---

was actually litigated and necessarily determined in a prior action, such as a criminal trial. *See Dettman v. Kruckenberg*, 613 N.W.2d 238, 249 (Iowa 2000) ("we conclude that in appropriate cases a criminal case conviction may be preclusive in a later civil suit as to those issues that were previously litigated in the criminal proceeding."). The Iowa Supreme Court has concluded that a prior conviction is "preclusive" in a later civil suit from contesting facts necessarily established in the criminal trial. *Dettman,* 613 N.W.2d at 249 (in wrongful death action brought by the victim's estate against the teenager who had been convicted of vehicular homicide in the victim's death, the Iowa Supreme Court ruled that the teenager's prior criminal conviction precluded him from litigating the identity of the driver in the civil case). *See Dettmann*, 613 N.W.2d at 249. Here, Church's conviction for assault on Anderson is preclusive in this case. What's more, Anderson's testimony concerning Church's assault on him, and Anderson's response, are uncontroverted. Anderson testified that, after he directed Church to have a seat in the back of his patrol car, Church unexpectedly and repeatedly punched Anderson in the head. These punches left Anderson feeling as though he might lose consciousness. At the same time, Anderson felt a tug on his service belt. In response, Anderson warned Church that if he continued his attack, Anderson would shoot him. When Church ignored Anderson's warning and continued his assault, Anderson fired his service pistol, striking Church. Because Church has no memory of the events, Anderson is the only witness to the shooting and his account, therefore, stands unrebutted by definition.

offense of assault on a peace officer with intent to inflict serious injury. Church argues that the jury's failure to find that he possessed intent to inflict serious injury on Anderson renders Anderson's use of deadly force unjustified. This argument confuses Church's assaultive intent with the fact that the incident must be viewed from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and allow for the fact that Anderson was required to make a split-second decision in an incredibly tense and rapidly-evolving situation. *Loch*, 689 F.3d at 965; *Williams*, 764 F.3d at 980; *Brown*, 574 F.3d at 496. Judging Anderson's conduct from such a perspective, his actions were objectively reasonable in light of the facts and circumstances confronting him.

Finally, it must be noted that Anderson warned Church that he would shoot if Church did not halt his assault. Before employing deadly force, an officer should give "some warning" when it is "feasible" to do so. *Garner*, 471 U.S. at 11–12; *Malone v. Hinman*, 847 F.3d 949, 953 (8th Cir. 2017); *Loch*, 689 F.3d at 967. Anderson did precisely that before employing deadly force. Anderson's warning put Church on notice that his "escalation of the situation would result in the use of the firearm." *Estate of Morgan v. Cook*, 686 F.3d 494, 498 (8th Cir. 2012). Church ignored Anderson's warning at his own peril. Accordingly, I conclude that Anderson's use of deadly force in response to Church's assault on him was justified, and he is entitled to qualified immunity. *See Loch*, 689 F.3d at 965; *see also Malone*, 847 F.3d at 952 (affirming grant of qualified immunity to officer who shot armed suspect without warning after suspect ignored commands and ran toward other officers).

### D.    State Law Claims

Defendants also seek summary judgment on Church's Iowa common law claims for negligence and assault and battery. Defendants argue that, because Anderson's actions were objectively reasonable, Church cannot prevail on either of his state law claims. Church counters that summary judgment is inappropriate, at this point, because there are

genuine issues of material fact concerning whether Anderson's actions were reasonable under the circumstances.

Iowa Code § 804.8 states in pertinent part:

> A peace officer, while making a lawful arrest, is justified in the use of any force which the peace officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest.

IOWA CODE § 804.8. Over thirty years ago, the Iowa Supreme Court concluded that, in light of this statute, "an assault only occurs if the peace officer does not reasonably believe the particular force was necessary in the circumstances." *Johnson v. Civil Serv. Comm'n of City of Clinton*, 352 N.W.2d 252, 257 (Iowa 1984). Ten years later, the Iowa Supreme Court recognized that this statute establishes an "objective reasonableness" standard for the use of force by arresting officers, finding support for that reading in the United States Supreme Court's "qualified immunity" standard for "excessive force" claims in *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). *See Chelf v. Civil Serv. Comm'n of City of Davenport*, 515 N.W.2d 353, 355–56 (Iowa 1994). My conclusions, above, that there are no genuine issues of material fact and that Anderson's use of force was objectively reasonable, therefore, require that summary judgment also be granted on Church's state law claims. *See Lawyer v. City of Council Bluffs, Iowa*, 240 F. Supp. 2d 941, 953 (S.D. Iowa 2002) (concluding that, because the evidence was insufficient to demonstrate that the use of force by police officers was objectively unreasonable, that summary judgment be granted on state law claims for negligence and assault and battery).

### III.    CONCLUSION

For the reasons discussed above, defendants' Motions for Summary Judgment are granted as to all claims.

**IT IS SO ORDERED**.

**DATED** this 17th day of April, 2017.

MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA